1  Michael St. James, CSB No. 95653
   ST. JAMES LAW, P.C.
2  22 Battery Street, Suite 810
   San Francisco, California 94111
3  (415) 391-7566 Telephone
   (415) 391-7568 Facsimile
4  michael@stjames-law.com

5  Counsel for Inverness Advisors, LLC and Tom Peters

6

7

                    **UNITED STATES BANKRUPTCY COURT**
8
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9
                          San Francisco Division
10

11

12  In re                                   Case No. 20-30819 DM

13  BENJA INCORPORATED                       Chapter 7

14          Debtor

15  ─────────────────────────────           Case No. 21-03060 DM

    KYLE EVERETT, TRUSTEE
16          Plaintiff
                                             DATE:   January 28, 2022
17  vs.                                      TIME:   10:30 a.m.
                                             JUDGE:  Honorable Dennis Montali
18  THOMAS B. PETERS
            Defendant
19

20

21
                        **MOTION TO DISMISS**
22

23

24  **I.      SUMMARY**

25       Rule 9(b) requires that allegations of fraud be pled with particularity.  Fed. R. Civ. P. 9(b); Fed.

26  R. Bankr. P. 9(b).  That stricture has not been satisfied with respect to the First and Second Claims for

27  Relief, which seek to set aside the transfer as manifestations of "actual fraudulent intent" (the "actually

28

fraudulent" Claims for Relief). Those Claims for Relief rely entirely on the "Ponzi scheme presumption" (the "Ponzi Presumption") It has become increasingly questionable whether the Ponzi Presumption serves any appropriate purpose, but if it does, it is certainly inapt in the instant case.

If there is any factual basis for the actually fraudulent Claims for Relief *other than* the Ponzi Presumption, it has not been pled at all, let alone with particularity. If the actually fraudulent Claims for Relief rise or fall entirely on the Ponzi Presumption, at least the predicate facts for the application of the Ponzi Presumption must be pled with particularity.

## II.     THE RELEVANT FACTS, BRIEFLY STATED

Tom Peters, the Defendant, was an early, albeit modest, investor in Benja, and his company was engaged as a financial advisor and investment banker for Benja.

In early September of 2020, when Benja's business and prospects appeared to be expanding, Mr. Peters told Andrew Chapin, Benja's principal, that he was open to making a much larger investment of $500,000. Mr. Peters engaged in diligence, ultimately agreeing to wire the first $250,000 of his investment on September 17, 2020.

*On the same day,* he began to learn that Mr. Chapin had failed to disclose critically important, albeit developing, adverse facts: Benja's existing debt was in default, the CFO had resigned or been fired by Mr. Chapin and board members and company counsel were resigning. Mr. Peters attempted to stop the wire before it was completed but was unsuccessful. In the ensuing days, Mr. Peters berated Mr. Chapin for soliciting his funds without making essential disclosures, asserting that he was violating the securities laws and threatening instigate a criminal prosecution unless his funds were immediately returned. Mr. Peters became increasingly strident until, on September 25, 2020, one week after Mr. Peters' wire transfer, Mr. Chapin returned Mr. Peters' funds by wire.

Thereafter, it became apparent that Benja had reported non-existent accounts receivable to its

Bank and other creditors; Benja collapsed shortly thereafter;. Mr. Chapin was criminally prosecuted, and will shortly begin a 36 month sentence.

## III.   THE FACTS AND PONZI SCHEMES

In order to understand the issues at hand, it is important to distinguish between Very Bad Businesses and Ponzi schemes, which represent only a small subset of Very Bad Businesses.

Unfortunately, Very Bad Businesses represent a meaningful portion of the population of business bankruptcy cases. Clearly, Benja was a Very Bad Business. It published false financial statements, including fraudulently inflated account receivable statements, and intentionally defrauded creditors and investors. It wanted a factoring line with MHC, but MHC required a first-priority lien, so Benja forged a UCC-3 for its existing secured lender, forged a Delaware State seal on the UCC-3, presented it to MCH and promptly borrowed more than $5 million by factoring fictitious receivables. See, Adv, Proc. 21-3036. Benja was a Very Bad Business, but not necessarily a Ponzi scheme; none of its depredations respecting MCH, for example, are consistent with any ordinary understanding of the operation of a Ponzi scheme.

If one reads the Complaint assuming that Benja was merely a Very Bad Business but not a Ponzi scheme, the magnitude of the burden the Plaintiff expects the Ponzi Presumption to carry becomes apparent. In the absence of the Ponzi Presumption, one must answer the question: Who defrauded whom, how, and to what end? The Complaint provides very little in the way of answers to that question.

### A.   The Complaint, Without Presumptions

The relevant allegations of the Complaint are as follows:

Benja was a Very Bad Business

¶4.   Benja held itself out as a successful company that had agreements with various

retailers such as Backcountry, Columbia Sportswear, Fanatics, New Balance, Nike, Patagonia, and Zappos… ¶5 Benja [represented that it] generated millions of dollars in revenue and had large contracts with numerous well-known national companies…

¶5 Chapin admitted that Benja had no such contracts with or revenue from "these [unspecified] companies." Plaintiff is further informed and believes that Chapin also admitted to forging contracts, fabricating or altering documents that reflected revenue, using falsified documents, impersonating corporate representatives, or causing their impersonation, to create the appearance of business relationships and profitmaking opportunities that did not exist in order to obtain additional financing.

Benja / Chapin Defrauded Peters

¶18 Benja solicited an investment from Peters, falsely representing "that Walmart had shown interest in Benja's shoppable commerce unit that allegedly had been implemented in TikTok."

¶20 Chapin sent to Defendant the putative financial documents of Benja. Plaintiff is informed and believes that these documents were falsified documents made to induce Defendant to invest.

¶23 The CFO shared with two Board members "his concerns about Chapin and Benja and his discovery of millions of dollars in undisclosed obligations that Chapin had caused Benja to incur."

The Transfers

¶25 On or about September 17, 2020, Defendant made a wire transfer to Benja in the amount of $250,000.

¶26 *[On the same day*, the CFO] participated in a conference call with Benja's board of directors and legal counsel to discuss his concerns about Benja, particularly the certifications by

Chapin to investors that Benja was not in default of any loans. This certification was problematic, as loans from Busey Bank, Empowerment Capital, and MHC Financial Services were in default at the time. [The CFO] demanded full access to Benja's books and records, so that he could begin the process of accurately presenting Benja's financial condition to lenders and investors.

¶31 A large creditor accelerated its loan pursuant to a notice dated September 18, 2020 [the day one which Peters' wire transfer was received]. Counsel and some Board members threatened to resign if the CFO was not reinstated.

¶36 On September 22, 2020, Chapin e-mailed Defendant the following: "Given how much has changed in a material way, we will offer an opportunity to un-wind your [2020] SAFE agreement, repurchasing for the full value that has been sent ($250,000)."

¶37 Plaintiff is informed and believes that Defendant was on notice or had actual knowledge of Benja's apparent fraudulent activity.

¶39 On September 25, 2020, Defendant agreed to accept a refund and to waive all claims "if and only if the funds are received today."

¶42 Chapin transferred funds from Benja's account into his own, and wired the refund to Peters on September 25, 2020 from his own account.

¶45 Five days later, Peters sent Chapin an email, noting that receipts from a significant account debtor had not shown up in Benja's bank records, inferring "Thus the assumption is that the statements are forged. There is a pretty long list of open questions like this regarding past statements, forged names of other investors who claim not to have invested, etc."

Apart from conclusions about the Ponzi Presumption, those are *all* of the relevant factual allegations of the Complaint.

**B.**     *Actual Fraud, Without Presumptions*

The Complaint asserts that the refund to Peters was made with "actual fraudulent intent." If so, let's see how the Complaint answers the obvious questions: who defrauded whom, how, and to what end?

*Who was the fraudster?:*     The obvious alternatives are Benja and Chapin. But even with this simplest question, there is unanswered ambiguity. Benja had enacted a two-signature requirement which could not be met here, so Chapin acted as immediate transferee to effect the transfer. Does that mean that Benja did not have the fraudulent intent, Chapin did? Or was Chapin the mere instrumentality of Benja's fraudulent intent, which it could not directly implement? Or a little of each?

*Who was defrauded?* Simplistically, of course, Peters was defrauded: that fraud is what set this chain of events in motion. On the other hand, that fraud was "cured" by the repayment: Peters is no longer a victim of fraud.

Typically in a Ponzi scheme, the objective is to defraud future investors into believing the underlying business is profitable and a good subject for investment. Clearly, no possible future investor would take Benja's reluctant acquiescence in returning an investment obtained by defrauding Peters as a reason to think all is well and to invest in Benja. Assuming, of course, that Benja was the fraudster.

Perhaps the most likely victim of the fraud is the prosecutors: Peters threatened to turn in Chapin to the prosecutors to serve time in securities fraud gaol, but in return for being repaid, he dropped that. Of course, this suggests, as Peters believed, that the transaction was done by Chapin, with Chapin's money, for Chapin's (fraudulent) purposes; that is, hiding his securities fraud.

*How, and to what end?*     The transfer complained of was a wire transfer from Chapin as immediate transferee to Peters as subsequent transferee. Chapin had obtained the funds from Benja immediately before making the transfer.

If the fraudster was Benja, the purpose was to repay Peters' rescission claim before he went

public with it, since the rescission claim was based in fraud. Clearly, repaying a fraud rescission claim without "extras" is a transfer for value, and does not implicate constructive fraudulent transfer issues. See, *In re United Energy Corp.,* 944 F.2d 589, (9th Cir. 1991).

Alternatively, if the transferor was Chapin, as Peters understood it was, the transfer would have been to avoid instigation of criminal fraud charges. It worked, so it was a transfer for some value, at least. Perhaps Chapin could argue that the benefit, at least in retrospect, was not worth what was paid, but how does Benja's Trustee make that argument?

Rather than attempting to plead, or even explain, how the elements of an actual fraudulent intent transfer could have occurred in this case, the Trustee waves at the Ponzi Presumption. On the face of the Complaint, that is the *only* basis on which actual fraudulent intent is pled. Absent the Ponzi Presumption, the Plaintiff would be required to plead the elements of actual fraud – who defrauded whom, how and to what end – and the Plaintiff seems to be entirely unable to do so. As the Complaint is drafted, the "actually fraudulent" Claims for Relief rise or fall on the Ponzi Presumption.

If there is a basis for finding "actual fraud" without relying on the Ponzi Presumption, the Plaintiff has not alleged it, let alone pled it with specificity, so it should be dismissed.


V.      **AT LEAST THE PONZI PREDICATES MUST BE ALLEGED**

Alternatively, the Plaintiff might concede that the actually fraudulent Claims for Relief rise or fall with the Ponzi Presumption. If so, it must still plead the elements – the existence of a Ponzi scheme, a transfer "in furtherance of" the Ponzi scheme – with much greater particularity. "In practice, a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007).

In some cases, there is a judicial finding of the existence of a Ponzi scheme, either in a criminal

or civil context, or the principal of the entity has acknowledged the existence of a Ponzi scheme in a plea agreement or in connection with sentencing. None of those things happened here.

As a consequence, if the Plaintiff is to rely on the Ponzi Presumption, he must state with specificity the factual basis for a finding that Benja was a Ponzi scheme. Demonstrating that Benja was a Ponzi scheme rather than merely a Very Bad Business will be difficult.

The Ninth Circuit has defined a Ponzi scheme as follows:

> The fraud consists of funneling proceeds received from new investors to previous investors *in the guise of profits* from the alleged business venture, thereby *cultivating an illusion that a legitimate profit-making business opportunity exists* and inducing further investment.

*United Energy Corporation, supra*, 944 F2d at 590, n.1. (emphasis supplied).

Thus, in a Ponzi scheme, investors are defrauded into believing that the underlying business is successful and profitable, and funding distributions to investors from those profits. Clearly, that was not the case here. Benja was a start-up, admittedly "burning money," raising investments to fund its business operations in hopes that at some future juncture, its business would either become profitable, or more likely be acquired. More generally, it seems likely that most of Benja's funding came, not from defrauding investors, but from selling or hypothecating non-existent receivables to lenders: $5 million from Busey Bank and $5 million from MHC.

*No one* thought that Benja could survive for any material period of time without fresh infusions of new investments to keep the doors open. The core pretense of a Ponzi scheme – an apparently profitable and successful business which was throwing off money to investors – was entirely absent. None of the facts of this case can be reconciled with a Ponzi scheme, at least as the Ninth Circuit understands it.

Moreover, the payment at issue was not "in furtherance of" a Ponzi scheme. Making the payment would not have lured future investors to invest, the typical motive in a Ponzi scheme; making the payment was essentially an admission that Benja had unsuccessfully attempted to defraud a long-

standing investor into making a substantial additional investment based on false pretenses. Indeed, Mr. Chapin acknowledged that Mr. Peters would have believed that Benja could not have funded the payment itself and so the payment must have come from Mr. Chapin – scarcely something that would have furthered *any* nefarious purpose of Benja. Even if the Ponzi Presumption were found to apply to this case, it seems nearly impossible to explain how the payment at issue could have been "in furtherance of" a Ponzi scheme.[1]

In sum, even if Plaintiff agrees that the actually fraudulent Claims for Relief are entirely dependent on the Ponzi Presumption, much more pleading must be done to stake out a "plausible" contention that Benja was a Ponzi scheme and that the subject payment was in furtherance of it. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (to survive a challenge under Bankruptcy Rule 7012(b) and Civil Rule 12(b)(6), a complaint must state a claim for relief that is "plausible on its face.")

## VI. A FEW WORDS ABOUT THE PONZI PRESUMPTION

The Ponzi presumption has been broadly accepted in the Circuit Courts of Appeals, albeit without analysis.[2] Its acceptance appears to be based on a false tautology that "fraud is fraud:" since a

---

[1] Judge Bonapfel explained the "in furtherance" test:

The transfer must be an inherent and integral part of the fraudulent inducement scheme, and the continuation of the fraudulent inducement must depend on the transfer. Transfers that do not have these characteristics are not "in furtherance of" the Ponzi scheme.

*In re Int'l Mgmt. Assocs., LLC*, 563 B.R. 393, 413 (Bankr. N.D. Ga. 2017)

[2] The Ninth Circuit decisions, for example, do nothing more than recite the "fraud is fraud" tautology:

*Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (citing *Conroy v. Shott* and *Independent Clearing House*, the court stated, without elaboration, "[T]he debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme."). Ninth Circuit cases applying the Ponzi scheme presumption cite this case without discussion of the point. *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 704 (9th Cir. 2010) ; *Donnell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ; *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 814 (9th Cir. 2008).

Ponzi scheme inevitably fraudulently induces future investors to provide funds which will be lost, that is equivalent to "actual fraudulent intent" with respect to current creditors. While "fraud is fraud" is presented as obvious, the object of the fraudulent transfer laws is to prevent a diminution in the assets available for current creditors,[3] and defrauding future creditors only *increases* the assets available to current creditors. The two sets of laws have very different objectives. Victims of a Ponzi scheme are not without remedies – fraudulent inducement and unjust enrichment seem obvious avenues – but actual intent fraudulent transfer laws would not seem applicable.

That said, current Ponzi jurisprudence could be accomplished using constructive fraudulent transfer law. Since a Ponzi scheme will inevitably collapse, the Ponzi debtor is necessarily engaged in a business for which its capital and access to funding will be inadequate. The other element of constructive fraudulent transfer law – a transfer for less than reasonably equivalent value – is clearly present with respect to payments of interest or profits. It is not available with respect to avoiding a return of principal, as is well established. *United Energy, supra.*

In sum, what the Ponzi Presumption appropriately accomplishes could be accomplished by constructive fraudulent transfer law, unaided by any presumption. On the other hand, by "presuming away" the "less than reasonably equivalent value" leg of the constructive fraudulent transfer law, it seemingly permits the avoidance of transfers made for "reasonably equivalent value" – without support

---

*Int'l Mgmt, supra,* 563 B.R. at 408 n.27 (Bankr. N.D. Ga. 2017)

[3]    Judge Bonapfel explained:

> Recall that the law of actual fraudulent transfers focuses on the debtor's intent to hinder, delay, or defraud creditors by removing assets from their reach and diminishing the debtor's net worth. The payment of a particular debt as opposed to others—a *preferential* transfer—does not remove an asset from all creditors but only some of them. The payment of a valid debt, in other words, cannot be said to be made with the intent to defraud creditors because its very purpose is to pay a creditor.

*Int'l Mgmt, supra),* 563 B.R. at 405.

from any policy or principle.

The leading academic challenge to the Ponzi Presumption has been presented by Professor Ralph Brubaker, notably in his expert witness report in the *International Management Associates* Ponzi scheme case., available at https://ssrn.com/abstract=2981689. The leading judicial challenge to the Ponzi Presumption has been presented by Judge Bonapfel in the *International Management Associates* case: after explaining why the Ponzi Presumption is ill-advised, Judge Bonapfel acknowledged that he is bound by Circuit precedent finding its existence, but found that the transfer at issue was not "in furtherance of" the Ponzi scheme.

**VII.  CONCLUSION**

It is more than possible that this Adversary Proceeding is entirely about the Ponzi Presumption. As pled, it seems that every Very Bad Business must be a Ponzi scheme, or Benja's Very Bad Business will not be one.

Without the Ponzi Presumption, the actually fraudulent Claims for Relief  seem to fail, and the constructive fraudulent transfer claims seem unlikely to overcome the reasonably equivalent value rescission claim, which seems established in the Ninth Circuit.

If the Adversary Proceeding is entirely about the Ponzi Presumption. Plaintiff should say so, and plead the relevant elements of the Ponzi Presumption with particularity.  Of course, if there is some other basis on which Plaintiff can assert an "actual fraudulent intent" Claim for Relief, he should be required to do so.

DATED: December 26, 2021                          ST. JAMES LAW, P.C.


By: /s/  *Michael St James*    .
                    Michael St. James
Counsel for Defendants