Stephen D. Finestone (SBN 125675)
Jennifer C. Hayes (SBN 197252)
Ryan A. Witthans (SBN 301432)
FINESTONE HAYES LLP
456 Montgomery St., 20th Floor
San Francisco, California 94104
Telephone No.: 415.414.0466
Fax No.: 415.398.2830
sfinestone@fhlawllp.com
jhayes@fhlawllp.com

Attorneys for A. Kyle Everett,
Trustee in Bankruptcy

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>BENJA INCORPORATED, aka EPHE CORPORATION,<br><br>Debtor. | Case No. 20-30819 DM<br>Chapter 7 |
| A. KYLE EVERETT,<br>TRUSTEE IN BANKRUPTCY,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS B. PETERS,<br><br>Defendant. | Adversary Proceeding No. 21-03060 DM<br><br>**STIPULATION TO THE FILING OF A FIRST AMENDED COMPLAINT** |

Plaintiff, A. Kyle Everett, ("Plaintiff"), and Defendant, Thomas B. Peters ("Defendant"), by and through their attorneys of record, stipulate as follows:

**RECITALS**

A. On November 13, 2021, Plaintiff filed a complaint (the "Complaint") against Peters asserting claims for avoidance and recovery of an alleged fraudulent transfer.

B. February 15, 2022, Defendant filed his answer to the Complaint.

STIP TO FILE AMENDED COMPLAINT

C. Plaintiff now wishes to amend his Complaint to include a claim against Peters under Bankruptcy Code Section 547 for avoidance and recovery of a preference.

D. Defendant has agreed to stipulate to Plaintiff's filing of an amended complaint, a copy of which is attached hereto as **Exhibit A**.

Based on the foregoing, the parties stipulate as follows:

## STIPULATION

1. Plaintiff has leave to file the attached complaint as his amended complaint in this proceeding.
2. Regardless of whether a summons issues on the amended complaint, Defendant has 20 calendar days from the filing of the amended complaint to file his response.
3. The parties request that the Court issue an order approving this stipulation.

Dated: March 1, 2022          FINESTONE HAYES LLP

By: /s/ *Jennifer C. Hayes*
    Jennifer C. Hayes
    Attorneys for Plaintiff Kyle Everett

Dated: March 1, 2022          ST. JAMES LAW, P.C.

By: /s/ Michael St. James
    Michael St. James
    Attorneys for Defendant Thomas B. Peters

# Exhibit A

Stephen D. Finestone (SBN 125675)
Jennifer C. Hayes (SBN 197252)
Ryan A. Witthans (SBN 301432)
FINESTONE HAYES LLP
456 Montgomery St., 20th Floor
San Francisco, California 94104
Telephone No.: 415.414.0466
Fax No.: 415.398.2830
sfinestone@fhlawllp.com
jhayes@fhlawllp.com

Attorneys for A. Kyle Everett,
Trustee in Bankruptcy

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>BENJA INCORPORATED, aka EPHE CORPORATION,<br><br>Debtor. | Case No. 20-30819 DM<br>Chapter 7 |
| A. KYLE EVERETT,<br>TRUSTEE IN BANKRUPTCY,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS B. PETERS,<br><br>Defendant. | Adversary Proceeding No. 21-03060-DM<br><br>**AMENDED COMPLAINT FOR AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFER FRAUDULENT TRANSFER; DISALLOWANCE OF CLAIM; AND DECLARATORY RELIEF** |

Plaintiff A. Kyle Everett, Trustee in Bankruptcy ("Plaintiff" or the "Trustee") of the estate of Benja Incorporated ("Benja" or the "Debtor"), aka EPHE Corporation, files this first amended compliant against Defendant Thomas B. Peters ("Defendant" or "Peters"), and in support thereof alleges as follows:

1. Benja is a Delaware corporation that filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on October 15, 2020 (the "Petition Date").

2. The Trustee was appointed as the Chapter 11 trustee on November 3, 2020. The Chapter 11 case was converted to Chapter 7 on January 29, 2021, and the Trustee was appointed as the Chapter 7 trustee.

3. This adversary proceeding seeks the avoidance and recovery of transfers from Benja to Defendant made as part of a fraudulent scheme wherein Benja defrauded creditors and investors to obtain funds used for the personal expenses and benefit of its Chief Executive Officer, Andrew J. Chapin ("Chapin"), to pay obligations that arose from earlier fraudulent transactions, and to continue and conceal the fraud.

4. Plaintiff is informed and believes that Benja was a San Francisco-based e-commerce startup company founded by Chapin, who served as Benja's CEO from its founding until at least September 2020.

5. Plaintiff is informed and believes that Benja held itself out as a successful company that had agreements with various retailers such as Backcountry, Columbia Sportswear, Fanatics, New Balance, Nike, Patagonia, and Zappos, to drive consumer traffic to purchase goods from the retailers, with Benja ostensibly to be compensated based on the number of impressions by consumers of Benja's advertising.

6. Plaintiff is informed and believes that Chapin falsely represented to creditors and investors that Benja generated millions of dollars in revenue and had large contracts with numerous well-known national companies to place advertisements for their excess inventory. Plaintiff is informed and believes that, in a plea agreement in his criminal case, Chapin admitted that Benja had no such contracts with or revenue from these companies. Plaintiff is further informed and believes that Chapin also admitted to forging contracts, fabricating or altering documents that reflected revenue, using falsified documents, impersonating corporate representatives, or causing their impersonation, to create the appearance of business relationships and profitmaking opportunities that did not exist in order to obtain additional financing.

7. Plaintiff is informed and believes that Chapin sought out loans and investors for Benja, from which Chapin obtained funds to use for his personal expenses and benefit, to pay obligations that arose from earlier fraudulent transactions, and to conceal Benja's ongoing fraud.

8. Plaintiff is informed and believes that, at all relevant times, and other than de minimis legitimate business transactions, Chapin operated Benja as a fraudulent scheme wherein Benja made payments to creditors and earlier investors from the proceeds of later, fraudulently obtained loans and investments, rather than from profits of the putative underlying business venture. This pattern of using new money from later fraudulent transactions to fund the fulfillment of earlier obligations constitutes a Ponzi scheme. The transfer of Benja's property to Defendant was pursuant to a Ponzi scheme and not related to any legitimate business transaction, because in fact no such legitimate profitmaking business existed.

9. Plaintiff is informed and believes that the transfer of Benja's property to Defendant was made as part of Benja's fraud, with the actual intent to hinder, delay, or defraud Benja's creditors, or that the transfer was not for adequate consideration, as discussed below. Plaintiff is informed and believes that Benja incurred obligations for the purpose of acquiring funds necessary for the continuation of the fraud. Plaintiff is informed and believes that, later, Chapin caused the transfer of Benja's property to Defendant with the purpose of concealing the ongoing fraud.

10. Plaintiff requests that this Court grant relief avoiding and recovering transfer(s) totaling no less than $250,000, identified as the "Fraudulent Transfer" below, pursuant to 11 U.S.C. §§ 544, 548, 550 and California Civil Code § 3439.04 et seq. Plaintiff seeks the disallowance of Defendant's claim(s), if any, under 11 U.S.C. § 502(d). Plaintiff also seeks relief declaring that Benja was operated as a Ponzi scheme.

**JURISDICTION AND VENUE**

11. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157(a), 157(b)(2) and 1334, and under Rule 5011-1 of the Bankruptcy Local Rules for the Northern District of California.

12. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (H), and (O).

13. This Court is the proper venue for this adversary proceeding pursuant to 28 U.S.C. § 1409(a), because the Debtor's Chapter 7 case is pending in this judicial district.

14. Plaintiff consents to entry of a final order and/or judgment by this Court.

**PARTIES**

15. Plaintiff is the duly appointed Chapter 7 trustee for the bankruptcy estate of Benja. The Trustee is duly authorized and empowered to pursue any and all claims of the Debtor's estate.

16. Plaintiff is informed and believes that Peters is an individual residing in California at 14 College Ct, Larkspur, CA 94939.

**FACTUAL ALLEGATIONS**

17. Plaintiff is informed and believes that Defendant was an earlier investor in Benja pursuant to a Simple Agreement for Future Equity (the "2019 SAFE") entered into on or about December 16, 2019, in the amount of $50,000 for the right to certain shares of Benja's capital stock.

18. On September 4, 2020, Chapin sent an e-mail to Defendant soliciting additional investment. Chapin represented that Walmart had shown interest in Benja's shoppable commerce unit that allegedly had been implemented in TikTok, and Walmart may be interested in joining Microsoft's bid for Benja. Chapin further represented that Benja planned to expand its arrangement with TikTok at a cost of $950,000 and hoped to raise additional investment from Benja's group of existing investors to fund that effort. Plaintiff is informed and believes that these representations were false and made to induce Defendant to invest in furtherance of the Benja fraudulent scheme.

19. On September 9, 2020, Defendant sent an e-mail to Chapin to express his interest in making a "much larger investment" in Benja, and asked to see a full diligence package, including Benja's current balance sheet, capitalization table, and contracts, prior to the additional investment.

20. Between September 9 and 10, 2020, Chapin sent to Defendant the putative financial documents of Benja. Plaintiff is informed and believes that these documents were falsified documents made to induce Defendant to invest in furtherance of the Benja fraudulent scheme.

21. On September 10, 2020, Defendant e-mailed Chapin seeking clarification regarding the balance sheet that Chapin sent to Defendant, which did not show any liabilities or debt despite

Defendant being aware of Benja's obligations to Busey Bank and Empowerment Capital. On the same day, Chapin replied to Defendant and represented that Benja had "[n]o obligations beyond Busey and Empowerment."

22. On or about September 14, 2020, Benja entered into a Simple Agreement for Future Equity (the "2020 SAFE") with Peters, pursuant to which Peters purchased the right to certain shares of Benja's capital stock for $500,000.

23. At or about the same time, on September 14, 2020, Joe Alouf ("Alouf"), Benja's Chief Financial Officer, participated in a call with two of Benja's directors, Scott Sklar ("Sklar") and Nick Foppe ("Foppe"), and Alouf shared with Sklar and Foppe his concerns about Chapin and Benja and his discovery of millions of dollars in undisclosed obligations that Chapin had caused Benja to incur.

24. On or about September 16, 2020, Alouf learned that Benja was in the process of raising $1.5 million in equity, of which about $1 million had been funded.

25. Plaintiff is informed and believes that on or about September 17, 2020, Defendant made a wire transfer to Benja in the amount of $250,000 pursuant to the 2020 SAFE. In a text message sent on September 17, 2020, Defendant explained that he would send the balance of the $500,000 investment after he converted other securities to cash.

26. At or about the same time, on September 17, 2020, Alouf participated in a conference call with Benja's board of directors and legal counsel to discuss his concerns about Benja, particularly the certifications by Chapin to investors that Benja was not in default of any loans. This certification was problematic, as loans from Busey Bank, Empowerment Capital, and MHC Financial Services were in default at the time. Alouf demanded full access to Benja's books and records, so that he could begin the process of accurately presenting Benja's financial condition to lenders and investors.

27. After Chapin failed to provide Alouf with access to Benja's books and records by the end of business day on September 17, 2020, Alouf sent an e-mail to Chapin and the other parties who participated in the conference call to notify them of Chapin's failure and that if Alouf did not receive access to Benja's books and records, Alouf could not continue with the company.

Chapin promptly replied to Alouf's e-mail purportedly accepting Alouf's "resignation," which Alouf interpreted to mean that he was fired.

28. On September 18, 2020, Chapin sent a text message to Defendant informing him that the wire transfer of $250,000 had not arrived. Defendant replied to Chapin: "It seems like there's something pressing on you for funds."

29. Later on September 18, 2020, Chapin sent a text message to Defendant confirming that Benja had received the $250,000 wire transfer.

30. On September 18, 2020, Defendant sent a text message to Chapin stated he "just got a somewhat panicked [voicemail] from Michael Stern [at Empowerment Capital], said that [Chapin] terminated [Alouf] yesterday. What's the situation there?"

31. As a result of Chapin's actions, Empowerment Capital accelerated its loan pursuant to a notice dated September 18, 2020. Benja's legal counsel, Fenwick, thereafter advised Chapin and Benja that if Alouf was not reinstated, Fenwick would withdraw as counsel. Benja's directors also advised Chapin that they would resign. Other investors demanded Alouf's continued involvement in the company.

32. On September 19, 2020, Chapin reinstated Alouf as Benja's CFO.

33. Plaintiff is informed and believes that, on or about September 22, 2020, Sklar and Foppe were removed from or left Benja's board of directors.

34. On September 22, 2020, Pano Anthos e-mailed Chapin, and copied Defendant and Alouf, to express his disapproval with Sklar and Foppe leaving Benja's board, stating that Chapin "cannot be the only board member," and directed Chapin to "give [Alouf] the passwords and usernames into the accounts."

35. Plaintiff is informed and believes that Alouf put in place an accounting control that required two authorized signatures before a wire transfer could be made from Benja to third parties. Plaintiff is further informed and believes that this control did not prohibit in-person withdrawals/transfers to insiders, such as Chapin.

36. On September 22, 2020, Chapin e-mailed Defendant the following: "Given how much has changed in a material way, we will offer an opportunity to un-wind your [2020] SAFE agreement, repurchasing for the full value that has been sent ($250,000.00)."

37. Plaintiff is informed and believes that Defendant was on notice or had actual knowledge of Benja's apparent fraudulent activity and/or Ponzi scheme prior to obtaining Benja's offer to repurchase the 2020 SAFE for $250,000.

38. On or about September 24, 2020, Chapin sent to Defendant the SAFE Repurchase and General Release Agreement dated September 24, 2020 (the "Repurchase Agreement"), agreeing that Benja would purchase the 2020 SAFE from Defendant for $250,000 in cash by wire transfer to Defendant's account.

39. On September 25, 2020, Defendant e-mailed Chapin with redline revisions to the Repurchase Agreement and stated: "I will execute this document and deliver to you with the understanding that you may release it to the company and it will be in effect when the full amount of $250,000 is received in my account at RBC Wealth Management. I commit to this agreement if and only if the funds are received today."

40. Plaintiff is informed and believes that the Repurchase Agreement was never fully executed but was fulfilled.

41. Plaintiff is informed and believes that Alouf refused to authorize transfer of $250,000 to Peters to repurchase of the 2020 SAFE from Defendant.

42. Plaintiff is informed and believes that, in light of Alouf's refusal, and in order to effectuate the transfer of $250,000 from Benja's account to Defendant for the purpose of repurchasing the 2020 SAFE, Chapin personally went to the bank (Chase Bank) and caused Benja to transfer the sum of $250,000 and additional amounts to Chapin's personal account at JPMorgan Chase Bank, N.A., on or about September 25, 2020, and then immediately wired $250,000 from Chapin's account to Defendant's account at US Bank/RBC Capital Markets (the "Preferential Transfer" or the "Fraudulent Transfer").

43. Immediately prior to the transfer of Benja's property to Chapin's account as described above, Chapin's account had a balance of only $39.62.

44. Plaintiff is informed and believes that the Debtor was insolvent at all relevant times, including from September 4, 2020 through the Petition Date, such that the sum of the Debtor's debts was greater than all of the Debtor's property at a fair valuation, and/or that the Debtor was not generally paying its debts as they became due.

45. On October 1, 2020, Defendant sent a reply e-mail to Chapin recognizing Benja's fraud, as follows:

> Andrew,
> I'm moving into new house right now and can't talk, probly [sic] can later today.
> Here's one thing I'll share - I don't think this has been handled well from several perspectives. I don't know all the facts. I know you spoke with Mike Birkel and I think that [Foppe] & I may be in line with his comments. That said, there are some simple facts that are disturbing and that people are very focused on.
> The pdf's of Busey statements from early 2020 that you gave investors show for example large deposits from Backcountry.com. [Alouf] got a data export of all Busey transactions since the account was opened and those deposits don't show up in Busey's records. Thus the assumption is that the statements are forged. There is a pretty long list of open questions like this regarding past statements, forged names of other investors who claim not to have invested, etc. Who's your counsel at Wilson?
> Tom

46. Plaintiff is informed and believes that, based on the information he had obtained, Defendant knew at the time the Fraudulent Transfer was made that his right to certain shares of Benja's capital stock under the 2020 SAFE was worthless or worth nowhere near the value he received from the Fraudulent Transfer. Moreover, whether Defendant knew that the interests held under the 2020 SAFE were worthless, those interests were in fact of no value at the time Defendant received payment for them.

**FIRST CLAIM FOR RELIEF**
**Avoidance and Recovery of Preferential Transfer**
**11 U.S.C. § 547(b)**

47. Plaintiff realleges each and every allegation set forth above and incorporates them by reference.

48. The Preferential Transfer was made within the 90 days before the voluntary petition was filed by the Debtor.

49. The Preferential Transfer was the transfer of an interest of the Debtor in property, was made to or for the benefit of the Defendant who was a creditor of the Debtor, was made on account of antecedent debt owed by the Debtor to the Defendant before the Preferential Transfer

was made, was made while the Debtor was insolvent, and enabled the Defendant to receive more than he would have received if the Preferential Transfer had not been made, and the Defendant had received payment as provided by the Bankruptcy Code.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**SECOND CLAIM FOR RELIEF**
**Avoidance of Actual Intent Fraudulent Transfer**
**11 U.S.C. § 548(a)(1)(A)**

50. Plaintiff realleges each and every allegation set forth above and incorporates them by reference.

51. The Debtor presently has one or more creditors whose claim arose either before or after the Fraudulent Transfer to Defendant.

52. The Debtor made the Fraudulent Transfer to Defendant within two years before the Petition Date.

53. The Fraudulent Transfer was a transfer of an interest of the Debtor in property, and was made with actual intent to hinder, delay, or defraud any entity to which the Debtor was indebted or became indebted on or after the date the transfer(s) was made. *See Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) ("[T]he debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme … that knowledge that a transaction will operate to the detriment of creditors is sufficient for actual intent") (internal citations omitted).

54. Chapin was the initial transferee of the Fraudulent Transfer, who immediately transferred that interest of the Debtor in property to Defendant. Such initial transfer is avoidable under 11 U.S.C. §§ 544, 548, 550 and California Civil Code § 3439.04 et seq.

55. Because the initial transfer from Benja to Chapin is avoidable, Plaintiff may seek to recover the Fraudulent Transfer or the value of such property against Defendant, who is the subsequent transferee for whose benefit the Fraudulent Transfer was made.

56. The aggregate amount of the Fraudulent Transfer may be in excess of the above-stated amount, and Plaintiff seeks avoidance and recovery of any and all additional transfers made as a part of the scheme.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**THIRD CLAIM FOR RELIEF**
**Avoidance of Actual Intent Fraudulent Transfer**
**11 U.S.C. § 544(b), California Civil Code § 3439.04(a)(1) et seq.**

57. Plaintiff realleges each and every allegation set forth above and incorporates them by reference.

58. The Debtor presently has one or more creditors whose claim arose either before or after the Fraudulent Transfer to Defendant.

59. Defendant obtained the Fraudulent Transfer as detailed above.

60. The Debtor made the Fraudulent Transfer to Defendant within four years before the Petition Date.

61. The Fraudulent Transfer was a transfer of an interest of the Debtor in property, and was made with actual intent to hinder, delay, or defraud any entity to which the Debtor was indebted or became indebted on or after the date the transfer(s) was made. *See Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) ("[T]he debtor's actual intent to hinder, delay or defraud its creditors may be inferred from the mere existence of a Ponzi scheme … that knowledge that a transaction will operate to the detriment of creditors is sufficient for actual intent") (internal citations omitted).

62. Chapin was the initial transferee of the Fraudulent Transfer, who immediately transferred that interest of the Debtor in property to Defendant. Such initial transfer is avoidable under 11 U.S.C. §§ 544, 548, 550 and California Civil Code § 3439.04 et seq.

63. Because the initial transfer from Benja to Chapin is avoidable, Plaintiff may seek to recover the Fraudulent Transfer or the value of such property against Defendant, who is the subsequent transferee for whose benefit the Fraudulent Transfer was made.

64. The aggregate amount of the Fraudulent Transfer may be in excess of the above-stated amount, and Plaintiff seeks avoidance and recovery of any and all additional transfers made as a part of the scheme.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**FOURTH CLAIM FOR RELIEF**
**Avoidance of Constructive Fraudulent Transfer**
**11 U.S.C. § 548(a)(1)(B)**

65. Plaintiff realleges each and every allegation set forth above and incorporates them by reference.

66. The Debtor presently has one or more creditors whose claim arose either before or after the Fraudulent Transfer to Defendant.

67. The Debtor made the Fraudulent Transfer to Defendant within two years before the Petition Date and the Fraudulent Transfer was a transfer of an interest of the Debtor in property.

68. The Debtor received less than a reasonably equivalent value in exchange for the Fraudulent Transfer, as the interests represented by the 2020 SAFE repurchased from Defendant was of no value.

69. The Debtor made the Fraudulent Transfer at a time when the Debtor (a) was insolvent on the date(s) that the Fraudulent Transfer was made, or became insolvent as a result of the Fraudulent Transfer; (b) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital; (c) intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured; or (d) made the Fraudulent Transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

70. Chapin was the initial transferee of the Fraudulent Transfer, who immediately transferred that interest of the Debtor in property to Defendant. Such initial transfer is avoidable under 11 U.S.C. §§ 544, 548, 550 and California Civil Code § 3439.04 et seq.

71. Because the initial transfer from Benja to Chapin is avoidable, Plaintiff may seek to recover the Fraudulent Transfer or the value of such property against Defendant, who is the subsequent transferee for whose benefit the Fraudulent Transfer was made.

72. The aggregate amount of the Fraudulent Transfer may be in excess of the above-stated amount, and Plaintiff seeks avoidance and recovery of any and all additional transfers made as a part of the scheme.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**FIFTH CLAIM FOR RELIEF**
**Avoidance of Constructive Fraudulent Transfer**
**11 U.S.C. § 544(b), California Civil Code § 3439.04(a)(2) et seq.**

73. Plaintiff realleges each and every allegation set forth above, and incorporates them by reference.

74. The Debtor presently has one or more creditors whose claim arose either before or after the Fraudulent Transfer to Defendant.

75. The Debtor made the Fraudulent Transfer to Defendant within four years before the Petition Date and the Fraudulent Transfer was a transfer of an interest of the Debtor in property.

76. The Debtor received less than a reasonably equivalent value in exchange for the Fraudulent Transfer, as the interests represented by the 2020 SAFE repurchased from Defendant was of no value.

77. The Debtor made the Fraudulent Transfer at a time when the Debtor (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the Debtor would incur, debts beyond the Debtor's ability to pay as they became due.

78. Chapin was the initial transferee of the Fraudulent Transfer, who immediately transferred that interest of the Debtor in property to Defendant. Such initial transfer is avoidable under 11 U.S.C. §§ 544, 548, 550 and California Civil Code § 3439.04 et seq.

79. Because the initial transfer from Benja to Chapin is avoidable, Plaintiff may seek to recover the Fraudulent Transfer or the value of such property against Defendant, who is the subsequent transferee for whose benefit the Fraudulent Transfer was made.

80. The aggregate amount of the Fraudulent Transfer may be in excess of the above-stated amount, and Plaintiff seeks avoidance and recovery of any and all additional transfers made as a part of the scheme.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**SIXTH CLAIM FOR RELIEF**
**Declaratory Relief**

81. Plaintiff realleges each and every allegation set forth above and incorporates them by reference.

82. Plaintiff alleges that Benja was operated as a Ponzi scheme.

83. To the extent Defendant disputes this contention, an actual controversy exists between Plaintiff and Defendant concerning whether Benja was operated as a Ponzi scheme.

84. Plaintiff desires a judicial determination and declaration of whether Benja was operated as a Ponzi scheme. Such a judicial determination is necessary and appropriate to the extent a controversy exists between Plaintiff and Defendant.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**SEVENTH CLAIM FOR RELIEF**
**Disallowance of Claim**
**11 U.S.C. § 502(d)**

85. Plaintiff realleges each and every allegation set forth above and incorporates them by reference.

86. Plaintiff objects to any claim or claims that Defendant has filed or may file or has asserted or may assert in this bankruptcy case unless Defendant has paid the amount, or turned over any such property, for which Defendant is liable under 11 U.S.C. § 550.

Based on the foregoing, Plaintiff requests judgment as set forth below.

**REQUEST FOR RELIEF**

Based on the foregoing, Plaintiff respectfully requests that the Court enter judgment, as follows:

A. On the first claim for relief, for a judgment against the Defendant avoiding and recovering the Preferential Transfer or the value of such property under 11 U.S.C. §§ 547(b) and 550 and preserving the Transfer for the benefit of the estate under 11 U.S.C. § 551.

B. On Plaintiff's second and third claims for relief, for judgment against Defendant avoiding and recovering for the benefit of the estate the Fraudulent Transfer (and any other transfer that may be proved at trial) or the value of such property under 11 U.S.C. §§ 548 and 550, and

preserving those transfers for the benefit of the estate under 11 U.S.C. § 551.

    C.    On Plaintiff's fourth and fifth claims for relief, for a judgment against Defendant avoiding the Fraudulent Transfer (and any other transfer to the Defendant that may be proved at trial) or the value of such property under 11 U.S.C. §§ 544(b) and 550, and California Civil Code Sections 3439 *et seq.*, and preserving those transfers for the benefit of the estate under 11 U.S.C. § 551.

    D.    On Plaintiff's sixth claim for relief, for equitable relief in the form of a judgment against Defendant declaring that Benja was a Ponzi scheme.

    E.    On Plaintiff's seventh claim for relief, for disallowance of any claim in favor of the Defendant in the Debtor's case until the Fraudulent Transfer identified above are returned to the estate.

    F.    For prejudgment interest and costs of suit.

    G.    For such other relief the Court deems appropriate.

Dated: March __, 2022        FINESTONE HAYES LLP

By: /s/ *Jennifer C. Hayes*
      Jennifer C. Hayes
      Attorneys for A. Kyle Everett, Trustee in Bankruptcy